LAGESEN, P. J.
*1019 *97 The "exclusive remedy" provision of the Workers' Compensation Law, ORS 656.018, generally makes an employer that satisfies its insurance obligations for subject workers immune from civil liability for injuries to a worker arising out of the worker's employment. That immunity extends to, among others, the employer's officers, directors, and employees. ORS 656.018(3). But there is an exception to that immunity: It does not apply "[i]f the negligence of a person otherwise exempt * * * is a substantial factor in causing the injury * * * and the negligence occurs outside of the capacity that qualifies the person for exemption under this section ." ORS 656.018(3)(d) (emphasis added).
This appeal concerns the scope of that exception, and requires us to assess how it applies to an officer or director who personally owns the property where the workplace injury occurred. Plaintiff is the personal representative of the estate of Renee Radziwon-Chapman,[1] who was killed in a cougar attack at the wildcat sanctuary that employed her, WildCat Haven, Inc. (WildCat Haven). Defendants Michael and Cheryl Tuller are officers and directors of WildCat Haven, but they personally owned the land on which the sanctuary was operated, and WildCat Haven leased it from them. After plaintiff brought claims against them individually, the Tullers invoked the immunity extended by ORS 656.018(3). As required by ORS 656.595(3), that preliminary question of immunity was tried to the court, which determined that the Tullers had not acted negligently "outside of the capacity" as officers and directors and, thus, were entitled to immunity on plaintiff's claims. The court therefore dismissed those claims and, further, dismissed a claim against a separate limited liability company owned by the Tullers, WildCat Haven Holdings I, LLC (Haven Holdings). Based on our review of ORS 656.018(3) and its legislative history, we conclude that the court was correct to dismiss the claims against the Tullers individually on the grounds of immunity, but reverse and remand the judgment dismissing the claim against Haven Holdings, which is not entitled to immunity.
*98 I. STANDARD OF REVIEW
Our standard of review derives from the procedural posture of this appeal. The question of defendants' immunity was tried to the court pursuant to ORS 656.595(3), which provides that challenges concerning the right to bring third-party actions in cases involving an injured worker "shall be determined by the court as a matter of law." The trial court took evidence on the question of immunity over the course of two days before making factual findings and issuing its ruling. In this posture, we review the trial court's factual findings for "any evidence" to support them, and we review its legal conclusions for errors of law. See Cornelison v. Seabold , 254 Or. 401, 408-09, 460 P.2d 1009 (1969) (holding that appellate review of a trial court's factual findings in a proceeding under ORS 656.595(3) is for "any evidence"); M. K. F. v. Miramontes , 352 Or. 401, 411, 287 P.3d 1045 (2012) (discussing Cornelison and stating that the question "whether the workers' compensation statute applied to the employee's claim and provided his sole remedy" involved "a preliminary question of law" for the court).
II. BACKGROUND
With that standard of review in mind, we recite the facts consistently with the trial court's factual findings (which are supported by evidence in the record), and we provide additional procedural context to frame the narrow issues on appeal.[2]
*1020 Michael and Cheryl Tuller started WildCat Haven, a nonprofit corporation that operates a wildcat sanctuary.
*99 Michael Tuller is the president of WildCat Haven, and Cheryl Tuller is its executive director. At the time of the events giving rise to this action, the sanctuary operated on land in Sherwood, Oregon, that the Tullers owned themselves. They leased the land to WildCat Haven for it to use as a wildcat sanctuary, and it housed approximately 60 cats, including tigers, cougars, bobcats, and other wildcats. WildCat Haven relied on volunteer workers and, in addition, had three paid employees: the decedent in this case, Renee Radziwon-Chapman, Cheryl Tuller, and Timothy Adams. Those three employees served as the primary animal keepers for the sanctuary.
Keepers were required to enter the wildcat enclosures for cleaning and maintenance. With regard to cougars, WildCat Haven's 2009 Facility Plan stated that "contacts" with the cats required a minimum of two qualified staff members. The policy further provided that "[t]wo qualified staff members shall work together during the lockout of dangerous animals. Once the animals are locked out, one staff member can safely enter the enclosure to clean or make repairs." The lockout procedure involved keepers luring the cougars into a "lockout" chamber, closing the lockout door, and securing that door with a light-duty gate latch; at that point, the keeper would finalize the lockout process by actually entering the enclosure and attaching a carabiner to the gate latch.
On November 9, 2013, Radziwon-Chapman was working alone at the sanctuary. At approximately 6:30 p.m., Michael Tuller discovered Radziwon-Chapman's body, fatally mauled, inside an enclosure where three cougars lived. Only one of the cougars was in a lockout chamber, and the other two were roaming freely in the enclosure. Because no one was working with Radziwon-Chapman at the time of her death, the circumstances that led to it are not fully known.
On the date of the accident, Cheryl Tuller and Adams were both out of town. Cheryl Tuller was in Minnesota to assist another animal sanctuary that had experienced a shortage of workers. She had become friends with the director of that sanctuary while networking among the small wildlife sanctuaries in the United States, which exchange *100 professional courtesies, including sharing knowledge, practices, and resources. Tuller understood that her decision, as executive director of WildCat Haven, to assist the sanctuary during crisis would help ensure that WildCat Haven would receive reciprocal courtesy if the need arose.
Adams, meanwhile, was in Scotts Mills, Oregon, building enclosures on property that was intended as a new site for WildCat Haven. The Scotts Mills property was owned by defendant Haven Holdings, a limited liability company whose sole members are the Tullers. Adams resided on the Scotts Mills property to facilitate the construction of the new enclosures necessary for the transition from Sherwood, but he was paid by WildCat Haven regardless of whether he was working in Sherwood or at Scotts Mills.
Plaintiff, the personal representative of Radziwon-Chapman's estate, subsequently brought tort claims against WildCat Haven, the Tullers, and Haven Holdings, but she settled the claims against WildCat Haven, which is not a party to this appeal. Her claim against the Tullers alleged five separate counts: one count based on a theory that the Tullers knew that they were leasing their land to WildCat Haven for a highly dangerous activity and were strictly liable for permitting it to carry on that activity in the manner it did and for failing to warn Radziwon-Chapman of the hazard of working around the animals without proper precautions; one count of negligence based on similar allegations; two counts based on a theory that the Tullers failed to furnish a safe workplace as owners of the property under Oregon's Employers' Liability Law (ELL), ORS 654.305 to 654.336 ; and one count based on the Tullers' failure as owners to comply with requirements of the Oregon Safe Employment Act (OSEA). As for the claim against *1021 Haven Holdings, plaintiff alleged that it was a joint employer of Adams and negligently exposed Radziwon-Chapman to a hazardous condition by instructing Adams to work at the Scotts Mills property, leaving Radziwon-Chapman to work alone at the sanctuary.[3] *101 The Tullers and Haven Holdings answered by asserting immunity under ORS 656.018(3). The immunity offered by ORS 656.018(3) has existed since ORS 656.018 was enacted in 1965, but the statute was amended effective June 2013, just before the accident in this case. Or. Laws 2013, ch. 488, §§ 2, 3. As a result of the amendments, the immunity does not apply "[i]f the negligence of a person otherwise exempt * * * is a substantial factor in causing the injury * * * and the negligence occurs outside of the capacity that qualifies the person for exemption under this section." ORS 656.018(3)(d).
The parties agreed that the preliminary question of immunity under ORS 656.018(3) was a matter for the court to decide by way of a bench trial, but they disagreed as to the law and the facts bearing on whether the Tullers had been negligent "outside of the capacity" in which they were immune. At trial, the Tullers and Haven Holdings adduced evidence that all of the Tullers' conduct-from staffing, to supervision, to policies and procedures, to the equipment used at the sanctuary-were taken as officers and directors of WildCat Haven, roles in which they are immune under ORS 656.018(3). They further argued that, under this court's decision in Varland v. Smith , 112 Or. App. 271, 274, 828 P.2d 1053, rev. den. , 313 Or. 628, 835 P.2d 917 (1992), and under generally accepted principles of workers' compensation exclusivity, an employer's principals do not lose that immunity and subject themselves to liability merely by owning the company property on which the workplace injury occurred. See Lex K. Larson, 10 Larson's Workers' Compensation Law § 113.02 (Matthew Bender rev. ed. 2018) ("[I]f the circumstances are such that a president and sole stockholder of a corporation would be immune to suit by an employee, he or she does not lose that immunity by being also the owner of the land." (Footnote omitted.)). In their view, the 2013 amendments did not alter the rule applied in Varland .
Plaintiff, on the other hand, argued that the plain text of the new exception in ORS 656.018(3)(d) had precisely that effect, expressly creating an exception to immunity whenever an officer or director owes legal duties to the worker in another capacity. And, plaintiff argued, by entering into a lease with WildCat Haven, the Tullers had "dual *102 responsibilities" in which they assumed certain nondelegable duties as landowners under the ELL and OSEA. Moreover, plaintiff argued that Cheryl Tuller had left Oregon on the weekend of November 9 to volunteer in a personal capacity in Minnesota out of friendship rather than professional courtesy, that Michael Tuller had directed Adams to Scotts Mills in his capacity as a member of Haven Holdings rather than president of WildCat Haven, and that, in any event, Haven Holdings was not Radziwon-Chapman's employer or otherwise entitled to the extension of immunity.
After the parties presented their cases, the trial court issued a letter opinion in which it largely rejected plaintiff's legal and factual theory and concluded that "[t]he evidence proved that in this case, neither Michael Tuller nor Cheryl Tuller acted negligently outside the capacity that qualified them for exemption as the plaintiff's employers. This applies to the Tullers individually, collectively as landlords of the Sherwood property, and in their incarnation as [Haven Holdings]."[4]
*1022 The court, however, invited additional briefing from the parties with regard to plaintiff's ELL and OSEA claims against the Tullers. The letter opinion stated, "If the plaintiff believes that Michael and Cheryl Tuller lose their immunity under workers' compensation law on the no fault claims, regardless of the court's ruling that their actions in this case were only those of the President and Executive Director of WildCat Haven, Inc., then plaintiff must make its argument on that theory more clear."
In supplemental briefing, plaintiff reiterated her argument that the 2013 amendments had changed the legal framework and that, as a matter of law, the Tullers could be sued as landlords: "[A]ny action [the Tullers] took-or legally relevant omission they made-in furtherance of their lessee-lessor relationship with WildCat Haven Inc. is *103 by definition 'outside the capacity' as officer or director." The Tullers continued to rely on Varland and Larson's Workers' Compensation to argue that "[i]t is blackletter law that a corporate officer does not lose her immunity merely because she also owns the land where the injury occurs."
After receiving the supplemental briefing, the trial court issued a second letter opinion. In it, the court explained that plaintiff still had not identified "precisely what actions the plaintiff believes the Tullers took as landlords to implicate those claims" and that the Tullers had presented "stronger legal authority" that they were immune as landowners. The court then confirmed that its previous findings "encompass and extinguish the ELL and OSEA claims against the Tullers in their personal capacities as well." The court entered limited judgments dismissing with prejudice the claims against the Tullers and Haven Holdings, which plaintiff now appeals.
III. ANALYSIS
A. Claims Against the Tullers as Individuals
On appeal, plaintiff argues that the trial court's ultimate finding-that neither of the Tullers acted "outside of the capacity" of their immunity-resulted from the court's erroneous view of the exception in ORS 656.018 (3)(d). According to plaintiff, the Tullers' ownership of the Sherwood property meant that they were acting outside their immune capacity as a matter of law . As a result of leasing the property to WildCat Haven, the Tullers are landlords, "and plaintiff's decedent was not employed by them in that capacity. As such, any acts and omissions which the Tuller defendants undertook with respect to their role as landlords are 'outside the capacity' of their immunity" for purposes of the exception and expose the Tullers to strict premises liability, negligence, ELL, and OSEA claims.
An implicit premise of plaintiff's argument is that, for purposes of ORS 656.018(3)(d), acts or omissions occur in either an immune capacity or a nonimmune capacity, and the immunity afforded by ORS 656.018 to an individual turns on whether a plaintiff has alleged that the individual has breached a legal duty owed in the person's nonimmune *104 capacity. The Tullers disagree with that premise. In their view, the availability of immunity turns on the conduct underlying the claims, not the claims themselves. Further, they contend, the same conduct can occur in multiple capacities and still remain within a person's immune capacity. That is, the Tullers argue that the exception was intended to address circumstances in which an otherwise immune person's negligent conduct occurs exclusively "outside of" the immune capacity.
Thus, the central question in this appeal is one of statutory construction: What did the legislature intend when it created the exception to immunity in ORS 656.018(3)(d) if "the negligence occurs outside of the capacity that qualifies the person for exemption under this section"? To answer that question, we review the statutory text and context, while giving appropriate weight to any pertinent legislative history. See State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009).
1. The "capacity" exception
We begin with the text of ORS 656.018(3), which provides:
"The exemption from liability given an employer under this section is also extended to the employer's insurer, the self-insured *1023 employer's claims administrator, the Department of Consumer and Business Services, and to the contracted agents, employees, partners, limited liability company members, general partners, limited liability partners, limited partners, officers and directors of the employer, the employer's insurer, the self-insured employer's claims administrator and the department, except that the exemption from liability shall not apply :
"(a) If the willful and unprovoked aggression by a person otherwise exempt under this subsection is a substantial factor in causing the injury, disease, symptom complex or similar condition;
"(b) If the worker and the person otherwise exempt under this subsection are not engaged in the furtherance of a common enterprise or the accomplishment of the same or related objectives;
*105 "(c) If the failure of the employer to comply with a notice posted pursuant to ORS 654.082 is a substantial factor in causing the injury, disease, symptom complex or similar condition; or
"(d) If the negligence of a person otherwise exempt under this subsection is a substantial factor in causing the injury, disease, symptom complex or similar condition and the negligence occurs outside of the capacity that qualifies the person for exemption under this section ."
(Emphases added.)
Starting with that text, the meaning of one key word in paragraph (d), "capacity," is relatively straightforward: "Capacity" is "a position, character, or role either duly assigned or assumed without sanction < in his ~ as legal adviser> < served the government in several capacities>." Webster's Third New Int'l Dictionary 330 (unabridged ed. 2002); Black's Law Dictionary 235 (9th ed. 2009) (defining "capacity" as "[t]he role in which one performs an act < in her corporate capacity>").
The term "negligence" is more opaque. It can mean two related but different things in the law. It is commonly understood to refer to "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights." Black's at 1133; accord. Woolston v. Wells , 297 Or. 548, 557, 687 P.2d 144 (1984) ("Negligence is conduct falling below the standard established for the protection of others, or oneself, against unreasonable risk of harm."); Webster's at 1513 (defining "negligence" as "a failure to exercise the care that a prudent person usu. exercises"). Yet, it also can be used to describe the tort of negligence. See Black's at 1133 (providing, as a second definition of "negligence," "[a] tort grounded in this failure, usu. expressed in terms of the following elements: duty, breach of duty, causation, and damages").
The context of the term, however, signals that the legislature intended the term "negligence" to be understood in the former sense, that is, to refer to conduct rather than *106 a legal theory or tort claim. The paragraph begins, "If the negligence of a person otherwise exempt under this subsection is a substantial factor in causing the injury * * *." That initial use of the term "negligence" describes conduct that plays a role in the injury, not a tort claim or theory, and there is no reason to think the legislature used the term differently later in the same sentence. See Coos Waterkeeper v. Port of Coos Bay , 363 Or. 354, 364, 423 P.3d 60 (2018) ("We presume that the legislature intends the same word to have a consistent meaning throughout a statute."). Likewise, the other statutory exceptions to immunity, in paragraphs (a) through (c), focus on the conduct by the otherwise immune person, further indicating that the term "negligence" refers to conduct rather than a tort theory that may flow from that conduct.[5] Cf. *1024 Schutz v. La Costita III, Inc. , 364 Or. 536, 547, 436 P.3d 776 (2019) (concluding that a server or social host is immune from liability under ORS 471.565(1) only when alleged to be acting as a server or social host, and not in another role, such as property owner or employer, where the statute specifically referred to "claims for relief").
Finally, the fact that, in ORS 656.595(3), the legislature has provided for the issue of immunity to be resolved by way of a preliminary bench trial further corroborates this understanding of the term. If the legislature intended for immunity to turn, as a matter of law, on the nature of the claims against a person, and the particular legal duties the person was alleged to have violated, the legislature's decision to provide for a preliminary bench trial to resolve the immunity issue would not make much sense. See Cornelison , 254 Or. at 404, 460 P.2d 1009 (explaining that ORS 656.595(3) involves a bench trial of factual issues in addition to legal questions).
That leaves the issue of what it means for negligence to occur "outside of" a person's immune capacity. That phrase ordinarily means "beyond the limits or compass of." Webster's at 1604. Because the statute is focused on conduct, and because a single negligent act or omission can violate duties owed in multiple capacities, the phrase "outside of"
*107 yields an ambiguity that can be illustrated by a simple diagram:
The question is what did the legislature intend with regard to acts or omissions falling within the intersection between the person's immune capacity and the person's nonimmune capacity? The legislature could have intended for conduct to be automatically "outside of" the immune capacity whenever it is required by or violates legal obligations that arise from a relationship or theory different from the immune capacity, as plaintiff contends. See Larson, 10 Larson's Workers' Compensation Law § 113.01 ("[A] few courts have stretched the [dual-capacity] doctrine so far as to destroy employer immunity whenever there was, not a separate legal person, but merely a separate relationship or theory of liability ." (Emphasis added.)). Or, the legislature could have understood the exception, as the Tullers argue, to apply only where the negligent acts or omissions occurred wholly "outside of" the immune capacity.
Although both readings of the text are plausible, the broader context of the statute and its history persuade us that the legislature intended the exception to have the more limited scope described by the Tullers. Part of that context includes the case law preceding the adoption of the exception. See Schutz , 364 Or. at 548, 436 P.3d 776 (context includes case law leading to the adoption of the changes). ORS 656.018(3) was originally enacted in 1965, as part of a revision that made the workers' compensation scheme compulsory rather than *108 elective. See Bundy v. NuStar GP, LLC , 362 Or. 282, 287-88, 407 P.3d 801 (2017) (describing some of that history).[6] The statute extended an employer's *1025 immunity to "the employer's insurer, the board, and the employe[e]s, officers and directors of the employer, the employer's insurer and the board," and then included exceptions for injuries "proximately caused by wilful and unprovoked aggression by the person otherwise exempt under this subsection" and where the "workman and the person otherwise exempt under this subsection are not engaged in the furtherance of a common enterprise or the accomplishment of the same or related objectives." Or. Laws 1965, ch. 285, § 6.
In 1992, we held in Varland that immunity under ORS 656.018(3) turned on whether the conduct occurred in an immune capacity, not on whether the same conduct was alleged to breach duties owed in a nonimmune capacity. Varland involved wrongful death claims by the family of an employee of Coos Head Lumber and Plywood (Coos Head), who was crushed when the front-end loader he was driving rolled over while he was working. The defendant, Smith, was part owner, president, and an employee of Coos Head, but he personally owned the front-end loader. The plaintiffs alleged that, by permitting the loader to be operated without a roll cage, the defendant had acted negligently, violated the Employers' Liability Act, and was subject to third-party liability under ORS 656.154 notwithstanding the fact that Coos Head had accepted a compensation claim and was paying death benefits. Varland , 112 Or. App. at 273, 828 P.2d 1053.
Looking to the text of ORS 656.018(3), we concluded that the defendant was immune:
*109 "It is undisputed that defendant was both an officer and employee of Coos Head. It is also undisputed that, in his supervision of the decedent, defendant was acting in his capacity as president of Coos Head . Accordingly, defendant is exempt from liability under ORS 656.018, and plaintiffs' exclusive remedy is under the Workers' Compensation Act.
"Plaintiffs contend that their claims are against defendant as an individual and as the owner and person in control of the loader, not in his capacity as an officer or employee of Coos Head. Even so, defendant is entitled to the exemption provided by ORS 656.018, because he is both an officer and employee of the decedent's employer, and the decedent was injured in the course and scope of his employment . Compare Perkins v. Gehlar , 107 Or. App. 158, 811 P.2d 650, rev. dismissed , 312 Or. 554 [821 P.2d 1093] (1991)."
112 Or. App. at 274, 828 P.2d 1053 (emphases added).[7]
That holding in Varland -that the employer's president could not be liable as an owner for conduct that occurred in his immune capacity-was consistent with how many other courts had approached the issue at the time. See generally Annotation, Workers' Compensation: Third-party Tort Liability of Officer to Injured Worker , 76 ALR 4th 365 (1989) (listing cases in which an employer's officers were held to be immune even in an ownership capacity); Jackson v. Gibson , 409 N.E.2d 1236, 1238 (Ind. Ct. App. 1980) (rejecting the argument that the employer's president, who *1026 personally owned the building, could be liable as a landowner to the injured worker); see also Sharp v. Gallagher , 95 Ill. 2d 322, 328, 447 N.E.2d 786, 788 (1983) (" 'It is held with virtual unanimity that an employer cannot be sued as the owner or occupier of *110 land, whether the cause of action is based on common-law obligations of landowners or on statutes such as safe place statutes or structural work acts.' " (Quoting Arthur Larson, 2A Workmen's Compensation § 72.82 (1982).). But see, e.g. , Robards v. Kantzler's Estate , 98 Mich. App. 414, 419-20, 296 N.W.2d 265, 268 (1980) ("We find that in leasing a machine to the corporation which he controlled, [the president] was not acting in the course of his employment. * * * In this posture, he is subject to the same liabilities as any lessor who provides an allegedly defective product.").
The legislative history of ORS 656.018(3)(d) indicates that, in enacting it, the legislature did not intend to displace Varland 's rule that conduct occurring in both an immune and a nonimmune capacity is immune. For two decades after Varland , the relevant text of ORS 656.018(3) was basically unchanged, but statutes concerning corporate structures in Oregon evolved. Specifically, the legislature authorized the use of limited liability companies (LLCs). See Or. Laws 1993, ch. 173 (enacting the "Oregon Limited Liability Act"). Under that corporate form, an LLC is owned by "members," who can manage the LLC themselves or appoint a manager or group of managers to manage the company. ORS 63.001(17), (19), (20), (21). To integrate that corporate form with existing law, the legislature provided that, whenever a section of the Oregon Revised Statutes applies to "both 'partners' and 'directors,' " the section shall also apply to the member-managers or appointed managers. ORS 63.002(2).
In Cortez v. Nacco Materials Handling Group , 248 Or. App. 435, 274 P.3d 202 (2012), rev'd in part on other grounds , 356 Or. 254, 337 P.3d 111 (2014), we were presented with a case involving the intersection of workplace liability and that new corporate form. The plaintiff was employed by Sun Studs, LLC, a "member-managed LLC." Id . at 437, 407 P.3d 801. The defendant, Swanson Group, Inc., was the sole member of Sun Studs. After the plaintiff was injured by a forklift owned and operated by Sun Studs, he filed a workers' compensation claim against Sun Studs and filed a civil action against Swanson Group that included claims based on negligence and violation of the ELL. Among other defenses, Swanson Group asserted immunity under ORS 656.018, *111 arguing that it extended to the members of the LLC. The trial court agreed and dismissed the claims. Id . at 437-48, 274 P.3d 202.
On appeal, we reversed that ruling after concluding that the text of ORS 656.018(3) did not cover LLC members. We explained that, "[h]ad the legislature intended to exempt LLC members from liability, it could have easily done so, either by listing partners or by expressly including members in ORS 656.018(3). The legislature did not do so." Cortez , 248 Or. App. at 442, 274 P.3d 202. Thus, we held "that the exclusive remedy provision provided to employers in ORS 656.018 does not apply to members of an LLC employer." Id.
Our decision in Cortez , not Varland , was the impetus for the legislative amendments to ORS 656.018(3) that are the subject of this dispute. During the 2013 legislative session, while review of our decision in Cortez was pending in the Supreme Court, identical bills were introduced in the House and Senate for a " Cortez fix." See SB 678 (Introduced Feb. 26, 2013); HB 2923 (Introduced Feb. 18, 2013); Exhibit 5, House Committee on Business and Labor, SB 678, May 22, 2013 (letter submitted by House Small Business Task Force) (stating that, as a result of Cortez , businesses were operating under a "cloud of uncertainty" concerning their potential liability). As originally introduced, the legislation did no more than add the terms "partners, limited liability company members, general partners, limited liability partners, limited partners" to the listed persons in ORS 656.018(3). See SB 678 (Introduced Feb. 26, 2013); HB 2923 (Introduced Feb. 18, 2013).
However, after the legislation was introduced, interested stakeholders negotiated a set of compromise amendments, which were then approved by the Workers' Compensation *1027 Management-Labor Advisory Committee (MLAC).[8] See Audio Recording, House Committee on Business and Labor, HB 2923, Apr. 1, 2013, at 3:15 (testimony of Rep Bruce Hanna describing collaborative process among stakeholders), https://olis.leg.state.or.us (accessed Apr. 10, 2019). *112 Those compromise amendments were eventually enacted by the legislature, and they rephrased existing exceptions in ORS 656.018(3)(a) through (c) and added a fourth exception-the "capacity" exception:
"(3) The exemption from liability given an employer under this section is also extended to the employer's insurer, the self-insured employer's claims administrator, the Department of Consumer and Business Services, and to the contracted agents, employees, partners, limited liability company members, general partners, limited liability partners, limited partners, officers and directors of the employer, the employer's insurer, the self-insured employer's claims administrator and the department, except that the exemption from liability shall not apply:
"(a) [Where ] If the willful and unprovoked aggression by a person otherwise exempt under this subsection is a substantial factor in causing the injury, disease, symptom complex or similar condition [is proximately caused by willful and unprovoked aggression by the person otherwise exempt under this subsection ];
"(b) [Where ] If the worker and the person otherwise exempt under this subsection are not engaged in the furtherance of a common enterprise or the accomplishment of the same or related objectives; [or ]
"(c) [Where ] If the failure of the employer to comply with a notice posted pursuant to ORS 654.082 is a substantial factor in causing the injury, disease, symptom complex or similar condition [is proximately caused by failure of the employer to comply with the notice posted pursuant to ORS 654.082 .]; or
"(d) If the negligence of a person otherwise exempt under this subsection is a substantial factor in causing the injury, disease, symptom complex or similar condition and the negligence occurs outside of the capacity that qualifies the person for exemption under this section ."
Or. Laws 2013, ch. 488, § 1 (additions in boldface; deletions italicized and bracketed).[9]
*113 Thus, the new exception corresponded with an expansion of exclusivity to include persons who had ownership interests in an employer but not necessarily roles like officers, directors, or employees. By expanding the pool that way, the amendments increased the possibility that an employee could be injured by someone with no actual connection to the workplace, but who might nonetheless claim immunity based merely on an ownership status. That enactment history suggests that the exception in paragraph (d) was intended to operate as a limitation on the corresponding expansion in subsection (3), so that persons whose conduct occurred exclusively outside their immune capacity would not be immunized merely because of their ownership interests in the employer.
Additional legislative history confirms that reading of the exception. As previously noted, the amendments were approved by MLAC, a committee that includes representatives of workers and employers. During a committee meeting, one of the stakeholders who negotiated the compromise, Chris Davie of SAIF Corporation, was asked to explain the amendments, and he provided exactly that example-an injury to an employee by an owner with no connection to the workplace. With regard to the "capacity" exception, he stated:
"The [Oregon] Trial Lawyers Association was concerned about the situation where a person who might be exempt because of an ownership relationship with the business that employs somebody who is *1028 injured, if that person causes an injury to a person outside of the normal work environment. And the example that we've used, we've talked about a few times is, let's say you have a law firm where one of the owners of the law firm isn't working that day and they're driving down the street in their personal car and an employee of the law firm is taking some materials to another law firm * * * but they're working and the owner of the law firm is not working that day. And they come to an intersection and they crash, and it's the owner of the law firm who is negligent in causing that crash. And what, I think, the trial lawyers' concern was, that in a situation like that and other similar situations, that the exclusive remedy protection would not protect the owner of the law firm from liability because what they did was *114 really outside the work environment. So that's one of the examples that we've discussed. And we had conversations with the trial lawyers' association, I've been in contact with the Department of Justice about how to accurately express that, and we agreed on the words that are in the amendment."
Audio Recording, Management-Labor Advisory Committee, Full Meeting, Mar. 22, 2013 at 4:30 (comments of Chris Davie, SAIF Corporation (emphases added)). Shortly after that explanation, MLAC approved the compromise amendments; that approval was then conveyed to the legislators who were considering the amendments in committee. Audio Recording, Senate Committee on Business and Transportation, SB 678, Apr. 18, 2013, at 33:20 (testimony of Drew Hagedorn, Associated General Contractors and the Self Insurers Association, explaining that the -1 amendments to SB 678 encapsulated an agreed-upon consensus among stakeholders that was approved by the Workers' Compensation Management-Labor Advisory (MLAC)), https://olis.leg.state.or.us (accessed Apr. 10, 2019); Audio Recording, House Committee on Business and Labor, SB 678, May 22, 2013, at 12:35 (testimony of Drew Hagedorn, Associated General Contractors and Self Insurers Association, explaining that the amendments to SB 678 had already been discussed and approved by legislators considering HB 2923), https://olis.leg.state.or.us (accessed Apr. 10, 2019); accord. Staff Measure Summary, HB 2923, 2013 ("The Management-Labor Advisory Committee voted on March 22 to support the measure as amended."). And, on the Senate Floor, the bill's carrier explained that the language was "unanimously approved by the MLAC board." Audio Recording, Senate Floor Debate, SB 678, Apr. 30, 2013, at 42:00 (statement of Sen. Chuck Thompson), https://olis.leg.state.or.us (accessed Apr. 10, 2019).
Moreover, although we are cautious about inferring too much from silence, we place some weight on the fact that there is not a single mention of Varland in the legislative history of the amendments. See State v. Stout , 362 Or. 758, 774, 415 P.3d 567 (2018) (concluding that, despite ordinary reluctance to draw inferences from legislative silence, the court would have expected to find some evidence of the state's proffered construction). The amendments were spurred by *115 a Court of Appeals decision regarding LLC members that the business community and the House Small Business Task Force viewed as upending settled expectations about workers' compensation coverage. See Exhibit 5, House Committee on Business and Labor, SB 678, May 22, 2013 (letter from House Small Business Task Force stating that "[w]e need to let small businesses know that indeed they have the protection under which they always believed they operated"). It seems unlikely that the legislature, as part of that fix, intended to overturn another Court of Appeals decision, Varland , that had been settled law in Oregon for two decades regarding the scope of immunity for officers, directors, and coemployees, without a single mention of that case.
That is especially true considering the complexity of the legal and policy issues surrounding the multiple capacity question presented in Varland . Courts around the country have struggled for decades to develop and articulate coherent standards for whether immunity should give way when an otherwise immune person has multiple capacities or legal personas, in part because of the potential effect on the overall balance struck by the workers' compensation system. See generally Larson, 10 Larson's Workers'
*1029 Compensation Law § 113.01 (describing complexities and jurisprudence concerning "dual capacity" and "dual persona" doctrines, and observing, with respect to California law, that "little would be left of exclusiveness * * * if exclusiveness were to be forfeited every time one of these 'additional' relationships figured in an accident"). Even courts that have recognized an exception to immunity that allows for a person to be held liable for conduct that occurs in both an immune and nonimmune capacity have attempted to cabin the doctrine in various ways, such as limiting it to circumstances in which the obligations and duties of the two capacities are unrelated and not inextricably linked. See, e.g. , Kolacki v. Verink , 384 Ill. App. 3d 674, 678, 323 Ill.Dec. 445, 893 N.E.2d 717, 722 (2008) (holding that a plaintiff cannot satisfy the "dual capacity" test when "the defendant's duties are so intertwined that the defendant's conduct in the second capacity does not generate any obligations that are unrelated to the duties flowing from the defendant's first capacity as employer, coemployee, or *116 agent"); Gaspard v. Graves , 934 So.2d 158, 161 (La. Ct. App. 2006), writ den. , 929 So.2d 1286 (La. 2006), writ den. , 929 So.2d 1289 (La. 2006) (the plaintiff failed to overcome exclusivity bar with respect to the individual owners of the employer where "their second capacity as owners of the building leased to [employer] is inextricably intertwined with their capacity as [the plaintiff's] employer such that they cannot be held liable in tort" (emphasis added)); accord. Garelle v. Geinitz , 145 A.D.3d 1383, 1384, 44 N.Y.S. 3d 575, 577 (2016) (holding that, "where the defendant is both the property owner and a corporate officer of the plaintiff's employer, the defendant's responsibility to provide the plaintiff with a safe place to work may be merged, in which case, workers' compensation benefits are the sole remedy for the plaintiff"; the defendant is subject to suit only if the "defendant's duty of care toward [the] plaintiff was owed purely in [the] capacity as owner of the property at the accident site, and not at all as a coemployee" (internal quotation marks and citations omitted)).[10] In other words, it is not an issue where we would expect the legislature to legislatively overrule longstanding precedent to adopt what appears to be a minority rule without any discussion or debate on the topic.
For those reasons, we conclude that the legislature's amendments to ORS 656.018(3) were most likely intended to limit the " Cortez fix" by excepting situations in which an otherwise immune person's negligent acts or omissions occurred exclusively "outside of" the immune capacity, as the example before MLAC suggested, and not as a broader repudiation of Varland or a more dramatic revision of the balance struck by Oregon's workers' compensation statutes. See Audio Recording, House Floor Debate, SB 678, June 12, 2013, at 3:14:56 (statement of Rep Brad Witt, describing the trade-offs of no-fault liability and exclusivity under the workers' compensation scheme as one of the "great compromises" of the past century; and explaining that the bill is necessary to extend the exclusive remedy protections to all *117 employers operating in the state and preserve the workers' compensation system for the next 100 years), https://olis.leg.state.or.us (accessed Apr. 10, 2019).
We therefore conclude that the immunity afforded by ORS 656.018(3) continues to operate in the way that we expressed in Varland , which appears to be consistent with the majority rule among other jurisdictions: Persons listed in the statute enjoy a broad grant of immunity for workplace injuries, even if they are acting in more than one capacity at the time of the injury. 112 Or. App. at 274, 828 P.2d 1053. ORS 656.018 (3)(d) carves out an exception to that broad grant in circumstances in which a person's negligent conduct occurs wholly outside the immune capacity-i.e. , when the negligent conduct is not inextricably intertwined with conduct giving rise to the immunity.
2. Whether the Tullers acted outside of their immune capacity
With that understanding of ORS 656.018(3)(d), we reject plaintiff's contention *1030 that the trial court erred in dismissing her claims against the Tullers individually. The court found that all of the Tullers' decisions regarding staffing, supervision, policies and procedures, and the equipment used at the sanctuary were made in their capacity as officers and directors of WildCat Haven. Plaintiff's ELL, OSEA, and premises liability claims are based on acts and omissions involving those very same decisions, albeit grounded in different legal obligations. Essentially, plaintiff alleges that the Tullers permitted activities that exposed the employees of WildCat Haven to dangerous risks and a dangerous workplace; however, that negligent conduct is inextricably bound up with the Tullers' decision-making as officers and directors.
As the trial court observed, plaintiff has never identified precisely what actions the Tullers took or failed to take as landlords that were separate and distinct from acts or omissions in their capacity as the officers and directors of WildCat Haven. The closest plaintiff comes is her reliance on two provisions of the lease agreement between the Tullers and WildCat Haven. One provision states, "[Tenant]
*118 shall not conduct a business deemed extra hazardous, a nuisance or requiring an increase in fire insurance premiums. Tenant warrants the leased premises shall be used only for the following type business: captive wildcat sanctuary." The second states, "In the event of any breach of the payment of rent or any other allowed charge, or other breach of this Lease, Landlord shall have full rights to terminate this Lease in accordance with state law and reenter and claim possession of the leased premises in addition to such other remedies available to Landlord arising from said breach." Plaintiff argues that the Tullers' failures with regard to those provisions depend exclusively on omissions in their capacity as landlords. But, on this record, even those omissions regarding lease obligations are indistinguishable from the Tullers' decisions concerning staffing, supervision, policies and procedures, and the equipment at the sanctuary-decisions that the trial court found were made as officers and directors. Accordingly, we reject plaintiff's contention that her claims against the Tullers as landlords-even to the extent they involve lease obligations-are based on negligent acts or omissions "outside of" the Tullers' immune capacity. We therefore affirm the judgment dismissing those claims.
B. Claims Against Haven Holdings
Last, we turn to plaintiff's claim against Haven Holdings, which alleged that the LLC was negligent in (a) taking Adams away from the Sherwood facility to build the Scotts Mills enclosures and (b) failing to warn Radziwon-Chapman of the dangers of working at the Sherwood facility. The trial court dismissed that claim after ruling that the court's capacity determination also applied to the Tullers "in their incarnation" as Haven Holdings. On appeal, plaintiff argues that the trial court erred in that respect, because Haven Holdings was not Radziwon-Chapman's employer and does not fall anywhere in the list of persons to whom the employer's immunity is extended under ORS 656.018(3).
From the outset of the trial, Haven Holdings' theory of immunity was somewhat unclear; it did not file a trial memorandum or make an opening statement. During closing arguments, however, it acknowledged that it "is somewhat *119 in a unique position compared to the other defendants here." It then proceeded to argue that, "[s]ince the LLC can only act through Mr. Tuller, it just makes sense that the extension should apply" to it as well.
Although the trial court apparently agreed with that contention, Haven Holdings does not attempt to defend the court's judgment on that ground. That implicit concession is well taken. Plaintiff correctly points out, as she did below, that ORS 656.018 provides immunity to a discrete group: the employer and "the employer's insurer, the self-insured employer's claims administrator, the Department of Consumer and Business Services, and to the contracted agents, employees, partners, limited liability company members, general partners, limited liability partners, limited partners, officers and directors of the employer, the employer's insurer, the self-insured employer's claims administrator and *1031 the department." Haven Holdings does not fall anywhere on that list.
Rather than defend the trial court's ruling concerning immunity, Haven Holdings argues that we should affirm the trial court's judgment because plaintiff cannot prevail on the merits of a negligence claim. It contends that the court's factual finding that the Tullers " 'made no demands on [any] WildCat Haven, Inc., employees in their separate capacity as members * * *' binds this Court." According to Haven Holdings, if the Tullers, the LLC's only members, were not acting as its agents, then "Holdings cannot be held vicariously liable for those actions." Thus, "[d]ismissal of the vicarious liability claim against Holdings where no agency relationship could be found was proper."
We cannot affirm the trial court's ruling on that basis. The question of the exclusivity of plaintiff's workers' compensation remedy is one that is committed to the trial court under ORS 656.595(3). See Cornelison , 254 Or. at 406, 460 P.2d 1009 (holding that "whether or not plaintiff's sole remedy is compensation benefits awarded pursuant to the Workmen's Compensation Act" is "not one known to the common law"). The question of Haven Holdings' vicarious liability , however, is not. See M. K. F. , 352 Or. at 412, 287 P.3d 1045 (" Cornelison is properly understood as standing only for the narrow proposition that *120 a statute that permits a court to decide the preliminary legal question of the applicability of the procedure that it creates is not unconstitutional."). Whether or not plaintiff can ultimately prevail on the claim on the merits, it was not subject to dismissal based on judicial factfinding in a preliminary trial under ORS 656.595(3). We therefore reverse the limited judgment dismissing plaintiff's claim against Haven Holdings and remand for further proceedings.
Limited judgment dismissing plaintiff's claims against Michael Tuller and Cheryl Tuller affirmed; limited judgment dismissing plaintiff's claim against WildCat Haven Holdings I, LLC, reversed and remanded.

Plaintiff is Nancy Doty, Inc. The record reflects that Nancy Doty is a professional fiduciary, and we refer to plaintiff as "her" throughout the opinion.

Although the parties essentially agree on our standard of review, plaintiff argues that the trial court engaged in impermissible factfinding by going beyond the question of the capacity in which the Tullers were acting and actually determining whether those actions were negligent-a question that plaintiff argues is reserved to the jury and is not one that can be decided by a court under ORS 656.595(3). As we will later explain, 297 Or. App. at 102 n. 4, we understand the trial court's ruling more narrowly than plaintiff contends, so we do not reach plaintiff's argument about the right to a jury trial with regard to claims against the Tullers.
Plaintiff also at times in her brief states that the trial court "abused its discretion" in making certain factual findings. To the extent that plaintiff is arguing that the court's findings are unsupported by evidence in the record, we reject that contention without discussion.

Plaintiff withdrew its other count against Haven Holdings, which had alleged a strict liability claim.

As noted earlier, 297 Or. App. at 98 n. 2, 439 P.3d at 1019 n. 2, plaintiff asserts that the trial court violated her right to a jury trial by deciding whether the Tullers acted negligently. Although some phrases in the court's initial letter opinion could be read that way in isolation, the remainder clarifies that the trial court was ruling on the capacity issue, not whether the acts themselves met the relevant standard of care. In recapping its opinion, the court stated, "The court has found that neither of the Tullers acted outside their roles as President and Director of WildCat Haven, Inc., therefore they retain immunity as the plaintiff's employers."

That construction is consistent, in fact, with plaintiff's contention that the exception to immunity is not confined to the common-law tort of "negligence" but would encompass any conduct that falls below the applicable standard of care, including the standard for her strict liability and statutory claims.

Before 1965, an employer could decide whether to participate in the workers' compensation system, and an injured worker could decide to accept compensation from the state accident fund or bring an action against the employer; if the injured worker accepted compensation, the injured worker was barred from bringing an action against the employer. See, e.g. , Kowcun v. Bybee , 182 Or. 271, 296, 186 P.2d 790 (1947) ("An injured workman cannot have both an award of compensation and an action for damages against a purported tortfeasor except in the specific instances mentioned in the act."). ORS 656.018 included that "exclusive remedy" concept but adapted it to the compulsory scheme. See Martelli v. R.A. Chambers and Associates , 310 Or. 529, 534-35, 800 P.2d 766 (1990) ("The immunity of an employer from any worker's claims, other than for workers' compensation, was continued in section 6 of the 1965 act, as worded in the 1913 Act * * * and now phrased in modern terms, in ORS 656.018(1) [.]").

Perkins , which plaintiff cites generally in her briefing, involved a different type of "capacity" question. In that case, the defendant was the plaintiff's coemployee but had been sued in a purely representative capacity as the trustee of the trust who leased property to their common employer. We held that the trustee was a legally distinct entity and therefore not the same legal person as the employee. 107 Or. App. at 162, 811 P.2d 650 ("We reject defendant's argument that, because Gehlar, the individual, is also the trustee, the trustee and the individual are the same entity and that the trustee is, therefore, plaintiff's coemployee. * * * There is no showing whatsoever that defendant [Gehlar as trustee, as opposed to Gehlar as an individual,] is an employee of the company and, therefore, a coemployee of plaintiff."). Varland did not involve claims against an individual acting in a representative capacity for a legally distinct person, and neither does this case. Our decision therefore does not address that circumstance.

MLAC is a 10-member committee appointed by the Governor, with five members representing labor and five representing employers. ORS 656.790(1). The committee reports findings and recommendations to the Legislative Assembly on various matters. ORS 656.790(3).

Although both the House and Senate versions of the bills were amended to reflect the compromise, SB 678 was the bill passed by the legislature.

We do not mean to imply an endorsement of the approach in those cases, or of the policy analysis in Professor Larson's treatise. We simply note the competing viewpoints and the complexity of the issue as context for our conclusion that the legislature likely did not intend to wade into the matter in this particular piece of legislation.